Filed 2/27/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H040847 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1238226) |
| v. | |
| JUAN JOSE REBULLOZA, | |
| Defendant and Appellant. | |

Defendant Juan Jose Rebulloza pleaded no contest to one count of indecent exposure for exposing himself on a street corner in San José.  The trial court granted a three-year term of probation to include one year in county jail as a condition of probation.  Among other conditions, the court ordered defendant to complete a sex offender management program as mandated by Penal Code section 1203.067.  Under subdivisions (b)(3) and (b)(4) of that statute, the court ordered defendant to "waive any privilege against self-incrimination and participate in polygraph examinations which shall be part of the sex offender management program" and "waive any psychotherapist/patient privilege to enable communication between the sex offender management professional and the probation officer."

Defendant challenges the constitutionality of these two waivers.[1]  First, we hold that the condition requiring a waiver of the privilege against self-incrimination is

_____

[1] This court has previously addressed these claims in three cases currently under review by the California Supreme Court.  (See *People v. Garcia* (2014) 224 Cal.App.4th 1283, review granted July 16, 2014, S218197; *People v. Friday* (2014)

prohibited by the Fifth Amendment under *Minnesota v. Murphy* (1984) 465 U.S. 420 (*Murphy*).  Second, we construe the waiver of the psychotherapist-patient privilege as requiring waiver only insofar as necessary to enable communication between the probation officer and the psychotherapist.  We hold that the waiver of the psychotherapist-patient privilege as construed in this fashion is not overbroad in violation of defendant's constitutional right to privacy.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

A. *Facts of the Offense*[2]

Around 11:30 p.m. on July 21, 2012, Lourdes Valle was driving on 13th Street through downtown San José.  When she stopped for a red light at Santa Clara Street, she saw defendant on the corner "with his private parts out."  Defendant's pants were down and his right hand was below his waist, but Valle did not see whether he was touching himself.  Valle testified defendant was moving toward her car while "spinning" or "dancing," and "it looked like he was having a great time."  Valle drove away and called the police.

A San José police officer responded to the call and found defendant standing at the corner of 13th Street and Santa Clara Street.  Valle subsequently picked defendant's photograph out of a lineup.  Defendant's rap sheet showed he had prior convictions for indecent exposure.

B. *Procedural Background*

Defendant pleaded no contest to one count of indecent exposure charged as a felony based on a prior conviction for indecent exposure.  (Pen. Code, § 314, subd. (1).)

225 Cal.App.4th 8, review granted July 16, 2014, S218288; *People v. Klatt* (2014) 225 Cal.App.4th 906, review granted July 16, 2014, S218755.)  Because this opinion discusses additional grounds not raised in those appeals, and because this opinion meets the standards set forth in California Rules of Court, rule 8.1105, subdivision (c), we certify this opinion for publication.

[2] Our statement of the facts is based on the transcript of the preliminary hearing.

On March 21, 2014, the trial court granted a three-year term of probation and imposed one year in county jail as a condition of probation. Among other conditions, the court ordered defendant to complete a sex offender management program as mandated by Penal Code section 1203.067, subdivision (b)(2). Furthermore, under subdivisions (b)(3) and (b)(4) of that statute, the court ordered defendant to "waive any privilege against self-incrimination and participate in polygraph examinations which shall be part of the sex offender management program" and "waive any psychotherapist/patient privilege to enable communication between the sex offender management professional and the probation officer." Defendant filed written objections to both compelled waivers, but the court overruled both objections.

## II. DISCUSSION

Defendant challenges the two waivers mandated as probation conditions under Penal Code section 1203.067 (section 1203.067). He contends the condition requiring waiver of any privilege against self-incrimination under subdivision (b)(3) (section 1203.067(b)(3)) violates the Fifth Amendment and is overbroad. And he contends the condition requiring waiver of any psychotherapist-patient privilege under subdivision (b)(4) (section 1203.067(b)(4)) must be narrowly construed to enable communication between the sex offender management professional and the supervising probation officer. The Attorney General argues that both of these waivers are constitutional as worded.

A. *The Statutory Scheme and Applicable Regulations*

Under section 1203.067, subdivision (b)(2), any person placed on formal probation on or after July 1, 2012, for any offense requiring registration under Penal Code sections 290 through 290.023, "shall successfully complete a sex offender management program, following the standards developed pursuant to Penal Code section 9003, as a condition of release from probation." Section 1203.067(b)(3) requires "[w]aiver of any privilege against self-incrimination and participation in polygraph examinations, which shall be part of the sex offender management program." Section

3

1203.067 (b)(4) requires "[w]aiver of any psychotherapist-patient privilege to enable communication between the sex offender management professional and supervising probation officer, pursuant to Section 290.09."[3]

The Legislature enacted these provisions in 2010 to amend the Sex Offender Punishment, Control, and Containment Act of 2006 (hereafter, the "Containment Act"). (Stats. 2010, ch. 219, § 17.)  The Containment Act created "a standardized, statewide system to identify, assess, monitor and contain known sex offenders for the purpose of reducing the risk of recidivism posed by these offenders, thereby protecting victims and potential victims from future harm."  (Pen. Code, § 290.03, subd. (b), Stats. 2006, ch. 337, § 12.)  The Containment Act requires participation in an "approved sex offender management program" certified by the California Sex Offender Management Board (CASOMB).  (Pen. Code, § 9003.)

Under Penal Code section 9003, CASOMB promulgates standards for certification of sex offender management programs and "sex offender management professionals." (Pen. Code, § 9003, subds. (a) & (b).)  Such programs "shall include treatment, as specified, and dynamic and future violence risk assessments pursuant to Section 290.09." (Pen. Code, § 9003, subd. (b).)  Furthermore, sex offender management programs "shall include polygraph examinations by a certified polygraph examiner, which shall be conducted as needed during the period that the offender is in the sex offender management program."  (*Ibid.*)

Penal Code section 290.09 specifies that "[t]he certified sex offender management professional shall communicate with the offender's probation officer or parole agent on a regular basis, but at least once a month, about the offender's progress in the program and dynamic risk assessment issues, and shall share pertinent information with the certified polygraph examiner as required."  (Pen. Code, § 290.09, subd. (c).)  Penal Code section

---

[3] The same two waiver conditions apply to parolees.  (Pen. Code, § 3008, subds. (d)(3) & (d)(4).)

290.09 further requires the sex offender management professional to administer a State-Authorized Risk Assessment Tool for Sex Offenders (SARATSO) in two forms—the "SARATSO dynamic tool" and the "SARATSO future violence tool"—and to send the person's scores on these tests to the probation officer.  (Pen. Code, § 290.09, subd. (b)(2).)  The probation officer must then transmit the scores to the Department of Justice, which makes the scores accessible to law enforcement officials through the Department's website.  (*Ibid.*)

Penal Code section 9003 requires CASOMB to publish on its website the certification standards for sex offender management programs and professionals.[4] All polygraph examiners working with a certified sex offender management program must meet these certification standards.  (Cal. Sex Offender Management Bd., Post-Conviction Sex Offender Polygraph Standards at p. 1.)[5]  The standards set forth a model policy, program goals, the various types of examinations to be administered, and the types of questions that examinations should include, among other criteria.  These exams may be used "to test the limits of an examinee's admitted behavior and to search for other behaviors or offenses not included in the allegations made by the victim of the instant offense."  (*Id.* at p. 11.)  "Examiners, along with the other members of the community supervision team, should select relevant targets from their concerns regarding additional or unreported offense behaviors in the context of the instant offense."  (*Ibid.*) "Examiners should use the Prior Allegation Exam (PAE) to investigate and resolve all prior alleged sex offenses (i.e., allegations made prior to the current conviction) before

---

[4] We take judicial notice of the certification standards for sex offender management programs and professionals.  (Evid. Code, §§ 452, 459.)  Pursuant to Evidence Code section 455, subdivision (a), we requested letter briefs on the propriety of taking judicial notice of these documents.  Neither party objected.  Contemporary copies of the cited documents have been placed on file with the clerk of the court.

[5] This document is online at: <http://www.casomb.org/docs/Polygraph_Standards_FINAL.PDF> as of February 27, 2015].

attempting to investigate and resolve an examinee's history of unknown sexual offenses." (*Id.* at p. 12.) To discover "unreported victims," examiners should "thoroughly investigate the examinee's lifetime history of sexually victimizing others, including behaviors related to victim selection, victim access, victim impact, and sexual offenses against unreported persons." (*Id.* at p. 13.) The sex offense monitoring exam may be used at the request of other team members "to explore the possibility the examinee may have been involved in unlawful sexual behaviors including a sexual re-offense" during the period of supervision. (*Id.* at p. 22.) Questions about illegal conduct are not limited to sex offenses; they may include, but are not limited to, questions about the use or distribution of illegal drugs or controlled substances. (*Id.* at p. 21.)

B. *Waiver of Any Privilege Against Self-Incrimination Under Section 1203.067(b)(3)*

Defendant contends the required waiver of any privilege against self-incrimination under section 1203.067(b)(3) is unconstitutional under the Fifth Amendment and *Murphy*, *supra*, 465 U.S. 420. The Attorney General concedes that the Fifth Amendment prohibits the use of a probationer's compelled statements in a criminal proceeding. But the Attorney General argues that the waiver does not purport to allow such use. Instead, she contends the waiver is necessary to compel the probationer to participate in the sex offender management program.

Long-standing United States Supreme Court precedent prohibits a compelled waiver of the Fifth Amendment. (*Lefkowitz v. Cunningham* (1977) 431 U.S. 801; *Lefkowitz v. Turley* (1973) 414 U.S. 70; *Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation* (1968) 392 U.S. 280; *Gardner v. Broderick* (1968) 392 U.S. 273.) Furthermore, the Attorney General's interpretation of section 1203.067(b)(3) cannot be reconciled with the language of the statute or the meaning of the Fifth Amendment. Nothing in the Fifth Amendment prohibits the state from requiring the probationer to answer questions as part of the sex offender management program, provided no compelled statements are used in a criminal proceeding against him. Accordingly, we

6

conclude below that a waiver of all privileges under the Fifth Amendment is neither necessary nor constitutional as a means to further the purposes of the sex offender management program.

   1.  *The Meaning and Effect of the Statute*

   We begin with the language of the statute.  Both parties contend that the phrase "any privilege against self-incrimination" unambiguously includes the probationer's rights under the Self-Incrimination Clause of the Fifth Amendment.  We agree.  "[W]hen a word used in a statute has a well-established *legal* meaning, it will be given that meaning in construing the statute.  This has long been the law of California:  'The rule of construction of statutes is plain.  Where they make use of words and phrases of a well-known and definite sense in the law, they are to be received and expounded in the same sense in the statute.' "  (*Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 19 [quoting *Harris v. Reynolds* (1859) 13 Cal. 514, 518], original italics.)  Without a doubt, the privilege against self-incrimination is well established and definite under the Fifth Amendment.  Thus, the plain language of the statute—which requires a waiver of "*any* privilege against self-incrimination"—unambiguously includes a waiver of the probationer's rights under the Self-Incrimination Clause.

   To determine the effect of this waiver, we look to the nature of the rights being waived.  The Self-Incrimination Clause provides that no person "shall be compelled *in any criminal case to be a witness against himself.*"  (U.S. Const., 5th Amend., italics added.)  The "core" right under this clause is a criminal defendant's right not to have his officially compelled statements used against him in a criminal proceeding.  (*Chavez v. Martinez* (2003) 538 U.S. 760, 766-773 (plur. opn. of Thomas, J.); see *id.* at p. 777 (conc. opn. of Souter, J., joined by Breyer, J.); *Maldonado v. Superior Court* (2012) 53 Cal.4th 1112, 1128 (*Maldonado*).)  The California Supreme Court has recognized the same principle:  "As both this court and the United States Supreme Court have made clear, the Fifth Amendment does not directly prohibit the government from *eliciting* self-

7

incriminating disclosures despite the declarant's invocation of the Fifth Amendment privilege. *Absent a valid waiver of Fifth Amendment rights*, this constitutional provision simply bars the direct or derivative use of such officially compelled disclosures to convict or criminally punish the person from whom they were obtained." (*Maldonado*, *supra*, 53 Cal.4th at p. 1127, italics added.) Thus, by requiring the probationer to waive this core right, section 1203.067(b)(3) would allow the state to use the probationer's compelled statements against him in a criminal proceeding.

The Attorney General takes the position that the waiver is constitutional because the state can never use probationers' compelled statements against them in criminal proceedings. This argument is fundamentally at odds with the language of the statute. Because the Fifth Amendment is a right against the use of compelled statements in a criminal proceeding, it necessarily follows that a waiver of that right would *allow* for the use of probationers' compelled statements in criminal proceedings. The Attorney General's position to the contrary would effectively render the statute meaningless, as if the waiver did not waive "any privilege against self-incrimination." This begs the question of what right is waived under the statute.

The Attorney General's brief refers to a probationer's "right to remain silent" without citing any authority identifying such a right. This position is based on a misconception of the privilege against self-incrimination: that it grants an absolute right to remain silent under any circumstance. The United States Supreme Court has long made clear that the Fifth Amendment does not prohibit the state from requiring a probationer to answer questions in the course of probation, provided the state does not use such compelled statements in a criminal proceeding against the probationer. In *Murphy*, the court held: "[A] state may validly insist on answers to even incriminating questions and hence sensibly administer its probation system, as long as it recognizes that the required answers may not be used in a criminal proceeding and thus eliminates the threat of incrimination. Under such circumstances, a probationer's 'right to immunity as

8

a result of his compelled testimony would not be at stake,' [citations], and nothing in the Federal Constitution would prevent a State from revoking probation for a refusal to answer that violated an express condition of probation or from using the probationer's silence as 'one of a number of factors to be considered by a finder of fact' in deciding whether other conditions of probation have been violated." (*Murphy*, *supra*, 465 U.S. at p. 435, fn. 7.) As to a probationer's right to remain silent, *Murphy* holds only that a probationer may refuse to make "*nonimmunized* disclosures concerning his own criminal conduct." (*Murphy*, *supra*, 465 U.S. at p. 439, italics added.) The Attorney General concedes that defendant must have immunity from prosecution for any incriminating statements he is compelled to make. With immunity, defendant has no right to remain silent.

We are mindful of the canon of statutory construction "that a statute which is reasonably susceptible of two constructions should be interpreted so as to render it constitutional." (*San Francisco Unified School Dist. v. Johnson* (1971) 3 Cal.3d 937, 942.) But this principle does not allow us to ignore the plain language of a statute or misinterpret the Fifth Amendment. The plain language of the statute is not "reasonably susceptible" to the interpretation put forth by the Attorney General. The Attorney General's interpretation would ignore the required waiver of defendant's "core" Fifth Amendment right, and would instead construe the statute as requiring a waiver of a right that does not exist—the absolute right to remain silent. The Attorney General's interpretation effectively renders the statute superfluous, violating the basic rule that no part of a statute shall be construed to be " 'inoperative or superfluous, void or insignificant.' " (*AFL-CIO v. Deukmejian* (1989) 212 Cal.App.3d 425, 435 [quoting 2A Sutherland, Statutory Construction (4th ed. 1984) § 46.06, p. 104].)

We next consider the scope of the waiver under section 1203.067(b)(3) with respect to the timing and context of statements made by the probationer. The language in section 1203.067(b)(3) requiring the waiver is followed by: ". . . and participation in

9

polygraph examinations, which shall be part of the sex offender management program."

Nothing in this language clearly or unambiguously limits the required waiver to statements the probationer makes while participating in polygraph examinations or the sex offender management program. However, we will assume for the purposes of this opinion that the latter portion of the provision limits the application of the waiver to statements the probationer makes during the course of, and in response to questions posed as part of, the sex offender management program. Because we conclude below that this narrowing construction is insufficient to render the provision constitutional, we need not consider the constitutionality of any broader construction.

2. *Constitutionality of the Waiver Under Section 1203.067(b)(3)*

As explained above, section 1203.067(b)(3)'s plain language would require defendant to waive the Fifth Amendment's bar against the use of his officially compelled statements in a criminal proceeding against him. This bar against the direct or derivative use of officially compelled statements in a criminal proceeding is commonly referred to as "use and derivative use immunity" when granted in advance. (*Kastigar v. United States* (1972) 406 U.S. 441, 462.) Consistent with the Fifth Amendment, the state may compel a person to make statements—even incriminating statements—as long as the state grants immunity to that person. (*Ibid.*) The California Supreme Court has held that the right to immunity may apply even without a *formal* grant of immunity from a prosecutor. (*Spielbauer v. County of Santa Clara* (2009) 45 Cal.4th 704, 727 (*Spielbauer*).)

As a general matter, the Fifth Amendment bars a compelled waiver of immunity. The United States Supreme Court established this principle in its "penalty cases" jurisprudence. (*Lefkowitz v. Cunningham*, *supra*, 431 U.S. 801; *Lefkowitz v. Turley*, *supra*, 414 U.S. 70; *Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation*, *supra*, 392 U.S. 280; *Gardner v. Broderick*, *supra*, 392 U.S. 273.) This bar is necessary because any person executing such a waiver would be unable to assert the core right against self-incrimination in a subsequent criminal proceeding: "Once an immunity waiver is signed,

10

the signatory is unable to assert a Fifth Amendment objection to the subsequent use of his statements in a criminal case, even if his statements were in fact compelled. A waiver of immunity is therefore a prospective waiver of the core self-incrimination right in any subsequent criminal proceeding . . . ." (*Chavez*, *supra*, 538 U.S. at p. 768, fn. 2 (plur. opn. of Thomas, J.).) The "prophylactic rules" encompassed by the Fifth Amendment thereby protect against compelled waivers of immunity even in the absence of a criminal proceeding. (*Id.* at p. 772, fn. 3 (plur. opn. of Thomas, J.).) As noted in *Chavez*, "That the privilege is a prophylactic one does not alter our penalty cases jurisprudence, which allows such privilege to be asserted prior to, and outside of, criminal proceedings." (*Ibid*.)

The same principle holds true in the probation context. The United States Supreme Court first addressed this issue in *Murphy*, *supra*, 465 U.S. 420. In that case, Marshall Murphy was prosecuted for criminal sexual conduct. He pleaded guilty to false imprisonment and received three years' probation. (*Id.* at p. 422.) The terms of Murphy's probation required him to participate in a treatment program for sexual offenders and to be truthful with the probation officer "in all matters." (*Ibid.*) His probation conditions "contained no suggestion that his probation was conditional on his waiving his Fifth Amendment privilege . . . ." (*Id.* at p. 437.) In the course of his treatment, Murphy confessed to raping and murdering a teenage girl seven years earlier. (*Id.* at p. 423.) His treatment counselor gave this information to the probation officer, who confronted Murphy with it. (*Id.* at pp. 423-424.) Murphy confessed to the probation officer as well, who in turn told the police. (*Id.* at p. 424.) At no point did Murphy invoke the Fifth Amendment. He was later indicted for first degree murder for killing the teenage girl. (*Id.* at p. 425.)

The central issue in *Murphy* was whether Murphy's failure to invoke his Fifth Amendment rights allowed the admission of his incriminating statements against him at trial. The high court concluded that Murphy had voluntarily chosen not to invoke his

11

Fifth Amendment rights, notwithstanding the probation condition requiring him to answer questions. (*Murphy*, *supra*, 465 U.S. at pp. 433-434.) The court began its analysis by holding that the privilege against self-incrimination applies to probationers: "A defendant does not lose this protection [against self-incrimination] by reason of his conviction of a crime; notwithstanding that a defendant is imprisoned or on probation at the time he makes incriminating statements, if those statements are compelled they are inadmissible in a subsequent trial for a crime other than that for which he has been convicted." (*Id.* at p. 426.) The court then held that the probation condition requiring Murphy to answer questions truthfully did not, by itself, controvert this right; rather, his obligations were no different from those of any other witness in a proceeding: "The answers of such a witness to questions put to him are not compelled within the meaning of the Fifth Amendment unless the witness is required to answer *over his valid claim of the privilege.*" (*Id.* at p. 427, italics added.) Thus, the court held that Murphy was subject to the general rule that the privilege against self-incrimination is not self-executing; rather, the privilege must be claimed by affirmatively invoking it. Because Murphy failed to do so, his statements were not "compelled" under the Fifth Amendment, and the use of his statements against him at trial did not violate the Fifth Amendment. (*Id.* at p. 440.)

The court distinguished Murphy's circumstances from cases in which "the state not only compelled an individual to appear and testify, but also sought to induce him to forgo the Fifth Amendment privilege . . . ." (*Murphy*, *supra*, 465 U.S. at p. 434 [citing *Lefkowitz v. Turley*, *supra*, 414 U.S. at pp. 79-84 [state may not impose substantial penalties because a witness elects to exercise his privilege against self-incrimination]; *Sanitation Men v. Sanitation Comm'r*, *supra*, 392 U.S. at pp. 283-284; *Gardner v. Broderick*, *supra*, 392 U.S. at pp. 278-279].) The court noted: "The threat of punishment for reliance on the privilege distinguishes cases of this sort from the ordinary case in which a witness is merely required to appear and give testimony." (*Murphy*, *supra*,

465 U.S. at p. 435.) The court then held that if the state had threatened to revoke Murphy's probation for invoking the Fifth Amendment, this threat would have violated the Fifth Amendment, and his statements would have been inadmissible at trial. (*Ibid.*)

Thus, *Murphy* has long made clear that the state may not punish a probationer for invoking the Fifth Amendment. More recently, California courts have reaffirmed that *Murphy* stands for this principle. "[I]f the state puts questions to a probationer that call for answers that would incriminate him in a pending or later criminal proceeding, and expressly or by implication asserts that invocation of the privilege would lead to revocation of probation, the answers would be deemed compelled under the Fifth Amendment and thus involuntary and inadmissible in a criminal prosecution." (*Brown v. Superior Court* (2002) 101 Cal.App.4th 313, 320.) Furthermore, a threat to revoke probation for *failing to waive* the privilege against self-incrimination is tantamount to a threat to revoke probation for a "legitimate exercise of the Fifth Amendment privilege." (*Murphy*, *supra*, 465 U.S. at p. 438.) *Murphy* thereby prohibits the compelled waiver required by section 1203.067(b)(3).

3. *Overbreadth of the Waiver Requirement Under Section 1203.067(b)(3)*

Defendant further challenges the section 1203.067(b)(3) waiver as unconstitutionally overbroad and unnecessary to achieve the stated purposes of the statute. The Attorney General contends that the waiver is necessary to establish an effective treatment program. We conclude the waiver is not sufficiently tailored to the purposes of the statute.

"Inherent in the very nature of probation is that probationers 'do not enjoy "the absolute liberty to which every citizen is entitled." ' [Citations.] Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens." (*United States v. Knights* (2001) 534 U.S. 112, 119.) "Nevertheless, probationers are not divested of all constitutional rights." (*People v.*

13

*Barajas* (2011) 198 Cal.App.4th 748, 753.) "A probation condition that imposes limitations on a person's constitutional rights must closely tailor those limitations to the purpose of the condition to avoid being invalidated as unconstitutionally overbroad." (*In re Sheena K.* (2007) 40 Cal.4th 875, 890.)

As an initial matter, we note that the California Supreme Court has declined to apply this tailoring requirement with respect to the Fourth Amendment when probationers are subject to search conditions. (*People v. Bravo* (1987) 43 Cal.3d 600, 606-608 (*Bravo*).) The court has observed that "probation is a privilege and not a right, and that adult probationers, *in preference to incarceration*, validly may consent to limitations upon their constitutional rights—as, for example, when they agree to warrantless search conditions." (*People v. Olguin* (2008) 45 Cal.4th 375, 384 (*Olguin*).) (Italics added.) This reasoning is consistent with the inherently invasive nature of incarceration, wherein prisoners have no reasonable expectation of privacy, and Fourth Amendment rights against searches are severely limited. (*Hudson v. Palmer* (1984) 468 U.S. 517, 526.) A probationer afforded the privilege of avoiding incarceration thereby enjoys an immeasurably greater degree of privacy and freedom of movement, despite probationary search conditions. By accepting probation, he or she gives up no substantial Fourth Amendment rights not otherwise lost through incarceration. Recognizing these comparative circumstances, courts have construed an acceptance of probation as a broad—but not a *total*—waiver of Fourth Amendment rights. (*Bravo*, *supra*, 43 Cal.3d at p. 610 [probationary waiver of Fourth Amendment rights does not include searches undertaken for harassment, or searches for arbitrary or capricious reasons].)

By contrast, a waiver of "any privilege against self-incrimination," as required by section 1203.067(b)(3), would deprive a probationer of the full spectrum of his rights under the Self-Incrimination Clause—even those protections enjoyed by prisoners in custody. (See *Baxter v. Palmigiano* (1976) 425 U.S. 308, 316 [prison inmates compelled

to testify at disciplinary proceedings must be offered immunity and may not be required to waive it]; *McKune v. Lile* (2002) 536 U.S. 24, 36 (plur. opn. of Kennedy, J.) ["The privilege against self-incrimination does not terminate at the jailhouse door . . . ."].) The waiver required under section 1203.067(b)(3) puts probationers in a *worse* position than prisoners with respect to Fifth Amendment rights. Thus, presenting a defendant with a choice between imprisonment and total surrender of his rights against self-incrimination would belie the justification underlying the Fourth Amendment waiver—that a grant of probation is a *privilege*. (*Olguin*, *supra*, 45 Cal.4th at p. 384.) Such a "choice" cannot properly be deemed a voluntary waiver. " 'Were it otherwise, as conduct under duress involves a choice, it always would be possible for a State to impose an unconstitutional burden by the threat of penalties worse than it in case of a failure to accept it, and then to declare the acceptance voluntary . . . .' [Citation.] [¶] Where the choice is 'between the rock and the whirlpool,' duress is inherent in deciding to 'waive' one or the other. [¶] 'It always is for the interest of a party under duress to choose the lesser of two evils. But the fact that a choice was made according to interest does not exclude duress. It is the characteristic of duress properly so called.' " (*Garrity v. State of New Jersey* (1967) 385 U.S. 493, 498 [quoting *Union Pacific Railroad Co. v. Public Service Commission of Missouri* (1918) 248 U.S. 67, 70].) Consistent with this distinction, the United States Supreme Court has held that the protection of the Self-Incrimination Clause, unlike the Fourth Amendment, applies to both prisoners and probationers. (*Murphy*, *supra*, 465 U.S. at p. 426.)

Moreover, here it is not true that defendant has the option to retain his Fifth Amendment rights by choosing custody over probation. Under Penal Code section 3008, subdivision (d)(3), he would be required to enter an identical waiver upon being paroled. Thus, the justification for requiring probationers to waive their Fourth Amendment rights, as set forth in *Olguin*, *supra*, 45 Cal.4th 375, does not apply in this context.

15

We next consider whether the waiver is sufficiently tailored to its purposes to pass constitutional muster. Neither the language of the waiver nor the legislative history of the amendment that enacted it specifically states its purpose. As a general matter, public safety is "a primary goal" of court-ordered probation conditions. (Pen. Code, § 1202.7; *Olguin*, *supra*, 45 Cal.4th at p. 379.) Consistent with this goal, the overriding purpose of the sex offender treatment program is public safety through containment and reduction of recidivism by registered sex offenders. CASOMB observed that "[f]or the safety and well-being of California's citizens, especially those most vulnerable to sexual assault, it is essential to manage known sex offenders living in the state's communities in ways that most effectively reduce the likelihood that they will commit another offense . . . ." (Cal. Sex Offender Management Bd, Sex Offender Program Certification Requirements at p. 1.)[6] Treatment and rehabilitation of the offender are secondary purposes of the sex offender management program, and CASOMB publications emphasize the importance of their role in reducing recidivism. (*Id.*) Public safety is also the primary goal of polygraph testing as part of the sex offender management program. (Post-Conviction Sex Offender Polygraph Standards, *supra*, at p. 3.)

In this context, the reach of the waiver is extraordinarily broad. Subdivision (b)(3) of section 1203.067 requires waiver of "*any* privilege against self-incrimination . . . ." (Italics added.) The waiver applies equally and indiscriminately to probationers convicted of a broad swath of sex offenses ranging from indecent exposure to rape. (Pen. Code, §§ 290, subd. (c), 314.) The statute makes no distinctions based on the severity of the offense or the offender's level of future risk or dangerousness. And it takes no account of a probationer's intellectual capacity, mental health, or age.

---

[6] This document is online at: <http://www.cce.csus.edu/portal/admin/handouts/CASOMB Program 10-29-13 complete.pdf> [as of Feb. 27, 2015].

16

The statute imposes no limits of any kind on the subject matter of statements that may come under the waiver. The waiver is not limited to the offense for which the probationer has been convicted. Anything the probationer says may be used against him or her in a subsequent criminal proceeding. Because the waiver eliminates derivative use immunity, a probationer's statements could even be used against the probationer in a future criminal proceeding for an offense committed *after* the expiration of the probationary period. (*Marchetti v. United States* (1968) 390 U.S. 39, 53; *Prudhomme v. Superior Court* (1970) 2 Cal.3d 320, 326 [abrogated on other grounds] [the privilege forbids compelled disclosures which could serve as a "link in a chain" of evidence tending to establish guilt of a criminal offense].)

Under this broad waiver, a probationer who poses little or even no risk to the community could be compelled to confess to a crime committed long ago having no relevance to his or her current status as a sex offender. Any such confession could be given to police or prosecutors, who could then use it against the probationer to initiate an independent prosecution. The past offense could itself be a crime having little or no impact on public safety, and given the passage of time, prosecution of it may no longer serve the public safety purposes it may have served in the past.

A polygraph examiner, for example, could question the probationer, in the course of a video-recorded examination, about matters unrelated to the probationer's sex offense, such as past involvement with illegal drugs. The examiner could then provide the recording directly to the probation officer or even to law enforcement for use in a criminal prosecution against the probationer. (Evid. Code, § 351.1, subd. (b) ["Nothing in this section is intended to exclude from evidence statements made during a polygraph examination which are otherwise admissible."].) None of this is forbidden by the statute. To the contrary, various standards set forth in CASOMB publications encourage such a chain of events. Although CASOMB standards for polygraph examiners state that information from polygraph exams "should be kept confidential and provided only to

17

those involved in the containment approach to the supervision and treatment of sex offenders," the standards also make clear that law enforcement officials may be made part of the "containment team." (Cal. Sex Offender Management Bd, Sex Offender Program Certification Requirements at p. 6.) More importantly, the statute contains no language reflecting any restrictions on providing information to law enforcement officials.

To the contrary, other statutes explicitly *require* certain members of the containment team to reveal the probationer's statements to law enforcement for further investigation and prosecution. Probation officers, psychotherapists, district attorneys, and police officers are all "mandated reporters" under the Child Abuse and Neglect Reporting Act. (Pen. Code, § 11165.7, subds. (a)(15), (a)(18), (a)(12), (a)(34).) If any of these participants acquire knowledge—or even reasonable suspicion—of any child who has been the victim of child abuse or neglect, the participant is *required* to report the information to police or other qualified agencies. Failure to do so is a misdemeanor punishable by up to six months' confinement in a county jail or by a fine of one thousand dollars ($1,000), or by both that imprisonment and fine. (Pen. Code, § 11166.)

In conjunction with mandatory reporting requirements and CASOMB standards, a waiver of any privilege against self-incrimination results in a process whereby suspected offenses based on compelled statements—including those unrelated to the underlying offense—are effectively required to be presented for prosecution. First, the probationer, upon threat of revocation, would be compelled to submit to a polygraph examination. The examiner would then pose a raft of questions purposely designed to ferret out both past and current sexual misconduct. The probationer would be compelled to waive his privilege against self-incrimination and answer the questions. The examiner, consistent with CASOMB standards, would then be required to share the results of the examination with the probation officer or the prosecutor. These participants, in turn, would be compelled to report to the police any information constituting reasonable suspicion that

18

the probationer has committed any one of numerous offenses defined as child abuse and neglect. The results of this process could then be used against the probationer in a subsequent criminal prosecution. This is only one example of the potential problems that could ensue from the broad and indiscriminate waiver of the privilege against self-incrimination required by section 1203.067.

There is no doubt that a waiver of the privilege against self-incrimination would further public safety if it allowed for the prosecution of a dangerous sex offender who admits to an ongoing, dangerous offense that would otherwise go unreported after invocation of the privilege. But the scope of the waiver at issue here reaches too broadly. First, it gives the state carte blanche to use a probationer's statements against the probationer with no regard for the level of the threat he or she may pose to public safety. The waiver applies with equal force to the most dangerous offenders and the least dangerous. A rapist posing a high risk of reoffending is required to enter the same waiver as defendant here, who engaged in the comparatively less risky behavior of exposing himself on a public street. Second, the waiver allows for use of a probationer's statements in the prosecution of *any* offense—such as minor drug offenses[7]—with no consideration for the extent to which public safety is compromised.

Even in the case of dangerous offenders, is it unclear to what extent such a waiver is needed. As the high court observed in *Murphy*, the Fifth Amendment already allows the state to require a probationer to participate in treatment and answer questions truthfully. (*Murphy*, *supra*, 465 U.S. at p. 427.) Probationers may also be required to undergo polygraph testing. (*People v. Miller* (1989) 208 Cal.App.3d 1311, 1315 ["The mere requirement of taking the test in itself is insufficient to constitute an infringement of

---

[7] CASOMB-promulgated standards specifically advise polygraph examiners to inquire about the use of drugs, among other illegal conduct. (Cal. Sex Offender Management Bd., Post-Conviction Sex Offender Polygraph Standards, *supra,* at pp. 17, 21.)

the privilege."].)  If the circumstances surrounding the questioning are noncustodial, no *Miranda* warnings are required.  (*Murphy*, *supra*, at p. 433.)  If the probationer does not invoke the privilege against self-incrimination, the privilege is waived voluntarily.  Absent some other restriction, then, a probationer's statements may be used against him or her in a separate criminal prosecution.  (*Id.* at p. 440.)  Furthermore, if a probationer invokes the privilege in response to questions that pose no threat of self-incrimination (e.g., questions concerning probationary status), the state may revoke probation without violating the Fifth Amendment.  (*Id.* at 435, fn. 7.)  In light of these allowances, we see no overwhelming need for a compelled waiver of defendant's fundamental right to his privilege against self-incrimination.

For all of these reasons, we conclude that the section 1203.067 requirement of a waiver of "any privilege against self-incrimination" as a condition of probation is unconstitutionally overbroad with respect to defendant's rights under the Fifth Amendment.

### 4. *The Penalty Exception*

In *Murphy*, the court held that "if the State, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, *the failure to assert the privilege would be excused*, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution." (*Murphy*, *supra*, 465 U.S. at p. 435, italics added.)  The Attorney General contends this so-called "penalty exception" means the waiver here is constitutional because the probationer's statements could not be used against him in a criminal proceeding.  We respectfully disagree.

First, the Attorney General's argument ignores the plain language of the waiver under section 1203.067(b)(3).  If the waiver is valid, as the Attorney General asserts, then defendant has waived his ability to assert the Fifth Amendment in a subsequent criminal proceeding, and his statements would be admissible against him.

Second, the argument misconstrues *Murphy*. The Supreme Court held that, under the penalty exception, "the failure to assert the privilege would be excused." (*Murphy*, *supra*, 465 U.S. at p. 435.) This is simply an exception to the general rule that the Fifth Amendment must be affirmatively invoked; it does not render a compelled waiver constitutional. Under the penalty exception, Murphy's statements would have been inadmissible precisely because a threat to revoke his probation for asserting the privilege against self-incrimination *would have violated the Fifth Amendment*. The court in *Murphy* stated this explicitly in holding that "the State could not *constitutionally* carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege." (*Id.* at p. 438, italics added.) The holding that statements made under the penalty exception are inadmissible is simply an application of the exclusionary rule as required by the Fifth Amendment violation. As pointed out above, the Supreme Court in *Murphy* based this holding on its "penalty cases" jurisprudence. (*Lefkowitz v. Cunningham*, *supra*, 431 U.S. 801; *Lefkowitz v. Turley*, *supra*, 414 U.S. 70; *Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation*, *supra*, 392 U.S. 280, 283; *Gardner v. Broderick*, *supra*, 392 U.S. 273, 276.) The Attorney General does not address any of these earlier cases prohibiting compelled waivers.

The Attorney General's position would also introduce a serious practical difficulty. If the waiver were left intact, then a probationer's incriminating statements would automatically be immunized under the penalty exception, even if the probationer never invoked the Fifth Amendment. This automatic grant of immunity could complicate future prosecutions, because the prosecution would then bear "the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources." (*Kastigar*, *supra*, 406 U.S. at pp. 461-462.) By contrast, with the waiver condition stricken, the penalty exception does not apply, and a probationer must affirmatively invoke the Fifth Amendment to enjoy its protections. If defendant makes incriminating statements after failing to invoke the privilege, his statements could be used

21

against him in a criminal prosecution without violating the Fifth Amendment. (*Murphy*, *supra*, 465 U.S. at p. 440.) If, on the other hand, defendant invokes the Fifth Amendment in response to questioning, the questioner or the probation officer would have the opportunity to consult with the district attorney on the wisdom of compelling further statements and thereby conferring immunity.

The Attorney General adopts the position that the Fifth Amendment does not prohibit the state from requiring defendant to answer questions as part of his treatment program, provided his answers are not used against him in a criminal prosecution. We agree with this conclusion. As noted earlier, the Supreme Court has long made clear that requiring the probationer to answer questions—even if doing so is incriminating—does not violate the Fifth Amendment, as long as the probationer retains immunity. (*Murphy*, *supra*, 465 U.S. at p. 435, fn. 7.) Furthermore, if defendant refuses to answer questions posed to him as part of the treatment program, the state can use his silence as " 'one of a number of factors to be considered by a finder of fact' in deciding whether other conditions of probation have been violated." (*Ibid.*) Nonetheless, the Attorney General contends the waiver condition is necessary to compel the probationer to participate in the treatment program. But she does not explain why an express waiver of the Fifth Amendment is necessary when probationers can already be required to answer questions without violating the Fifth Amendment.

For these reasons, we are not persuaded by the Attorney General's arguments concerning the penalty exception and the necessity of the waiver. In our view, the waiver is not only unconstitutional, but unnecessary as well.

C. *Waiver of the Psychotherapist-Patient Privilege*

Section 1203.067, subdivision (b)(4) requires any defendant granted probation under the statute to enter a "[w]aiver of any psychotherapist-patient privilege to enable communication between the sex offender management professional and supervising probation officer, pursuant to Section 290.09." Defendant contends this condition is

22

overbroad in violation of his constitutional right to privacy. We hold that the waiver is constitutional provided it is narrowly construed to require waiver only insofar as necessary "to enable communication between the sex offender management professional and supervising probation officer, pursuant to Section 290.09."

1. *The Psychotherapist-Patient Privilege*

The California Supreme Court has recognized that communications between a patient and psychotherapist are protected by a psychotherapist-patient privilege based on the federal constitutional right to privacy. "The psychotherapist-patient privilege has been recognized as an aspect of the patient's constitutional right to privacy." (*People v. Stritzinger* (1983) 34 Cal.3d 505, 511 (*Stritzinger*).) In an earlier case, the court said: "We believe that a patient's interest in keeping such confidential revelations from public purview, in retaining this substantial privacy, has deeper roots than the California statute and draws sustenance from our constitutional heritage. In *Griswold v. Connecticut* [(1965)] 381 U.S. 479, 484, the United States Supreme Court declared that 'Various guarantees [of the Bill of Rights] create zones of privacy,' and we believe that the confidentiality of the psychotherapeutic session falls within one such zone." (*In re Lifschutz* (1970) 2 Cal.3d 415, 431-432 (*Lifschutz*).)

More recently, the court has questioned the continuing vitality of the constitutional bases for the psychotherapist-patient privilege. "Although over 40 years have elapsed since our decision in *Lifschutz*, the United States Supreme Court itself has not yet definitively determined whether the federal Constitution embodies even a *general* right of informational privacy." (*People v. Gonzales* (2013) 56 Cal.4th 353, 384 (*Gonzales*).) Following the lead of the United States Supreme Court in *Whalen v. Roe* (1977) 429 U.S. 589 and *NASA v. Nelson* (2011) 562 U.S. 134, the California Supreme Court in *Gonzales* merely assumed, without deciding, that such a right exists. (*Gonzales*, *supra*, 56 Cal.4th at p. 385.) No court has yet overruled the holdings of *Lifschutz* and *Stritzinger*, and we remain bound by them. (*Auto Equity Sales, Inc. v. Superior Court of Santa Clara County*

23

(1962) 57 Cal.2d 450, 455.) Accordingly, we will proceed under the assumption that defendant enjoys the right to a psychotherapist-patient privilege based on his federal constitutional privacy rights.

It is well established that "the right to privacy is not absolute, but may yield in the furtherance of compelling state interests." (*Stritzinger*, *supra*, 34 Cal.3d at p. 511.) In *Stritzinger*, the court began by considering the state's "competing interest" in creating an exception to the privilege. (*Ibid.*) The California Supreme Court reaffirmed its holding in *Lifschutz* that any such exception must be narrowly construed, *ibid.*, "concomitant with the purposes of the exception." (*Lifschutz*, *supra*, 2 Cal.3d at p. 435.) These principles resemble the tailoring analysis in which a court considers whether a probation condition imposing limitations on a person's constitutional rights is closely tailored to the purpose of the condition. (*In re Sheena K.*, *supra*, 40 Cal.4th at p. 890.)

In *Gonzales*, *supra*, 56 Cal.4th 353, the court recently considered the psychotherapist-patient privilege in the context of a proceeding under the Sexually Violent Predator Act (SVPA). The defendant, Ramiro Gonzales, had been convicted of multiple sex offenses over a 20-year period. (*Id.* at p. 358.) Gonzales was paroled in 2004 and he underwent psychological evaluation and treatment as a condition of parole. (*Id.* at p. 359.) After violating his parole conditions several times—including one incident in which he visited a children's playground—Gonzales was arrested and taken into custody. (*Id.* at pp. 359-360.) In 2006, the prosecution petitioned to commit Gonzales under the SVPA, and the matter was set for a jury trial.

Before trial, the prosecution sought to subpoena psychological records arising out of Gonzales' psychological treatment as a parolee. (*Gonzales*, *supra*, 56 Cal.4th at p. 361.) Gonzales moved to quash the subpoena on the basis the records were protected under the psychotherapist-patient privilege, relying in part on *Story v. Superior Court* (2003) 109 Cal.App.4th 1007 (*Story*) [psychotherapy records relating to therapy sessions engaged in as a condition of probation were protected by the statutory psychotherapist-

24

patient privilege and could not be obtained by a prosecutor who sought the records for use in a subsequent murder prosecution].) The court distinguished between Gonzales' statutory claim under *Story* and his claim under the federal constitutional right to privacy: "[W]e believe that in order to properly distinguish the federal constitutional issue from the state law issue, it is necessary, in determining whether the disclosure of defendant's therapy records and the admission of his therapist's testimony violated a federal constitutional right of privacy, to look to the specific nature and extent of the federal constitutional privacy interests that are actually implicated in this particular setting and to the permissible state law interests that would support the disclosure and admission of testimony in question in such a setting." (*Gonzales*, *supra*, 56 Cal.4th at p. 386.)

In its analysis, the court first noted that the constitutional privacy right invoked by Gonzales arose under the conditions of parole, and under the care of a psychotherapist funded by the state. (*Gonzales*, *supra*, 56 Cal.4th at p. 386.) The court then observed that "the federal Constitution grants states considerable leeway to impose very substantial limitations on the right of privacy retained by persons who are released on parole," citing *Samson v. California* (2006) 547 U.S. 843 (federal Constitution does not preclude a state from authorizing a search of a parolee at any time or place even in the absence of reasonable suspicion). Balanced against this "limited intrusion" of the privacy right at issue, the court held "the state has a particularly strong and legitimate interest in authorizing the disclosure and use of a parolee's prior statements that occur in parole-mandated therapy in a subsequent SVPA proceeding, especially when, as here, the parole-mandated therapy was occasioned by the parolee's prior conviction of a sex offense." (*Gonzales*, *supra*, 56 Cal.4th at pp. 387-388.) The court held that disclosure was therefore supported by "a legitimate and substantial state interest," such that Gonzales' federal constitutional right to the psychotherapist-patient privilege was not violated by the release of his psychological records. (*Id.* at p. 388.)

2. *Application to the Waiver Under Section 1203.067, Subdivision (b)(4)*

Consistent with the above principles, we consider the purpose of the waiver of the psychotherapist-patient privilege at issue here and the state's interest in compelling disclosure under it. Unlike the language of subdivision (b)(3), which mandates waiver of *any* privilege against self-incrimination, the wording of subdivision (b)(4) explicitly sets forth the purposes of the waiver of the psychotherapist-patient privilege: "to enable communication between the sex offender management professional and supervising probation officer, pursuant to Section 290.09." Section 290.09, in turn, requires communication between the sex offender management professional and the probation officer for two purposes. First, the sex offender management professional must provide the supervising probation officer with the probationer's scores on the SARATSO risk assessment tools. (Pen. Code, § 290.09, subd. (b)(2).) Second, the sex offender management professional must communicate with the probation officer about the probationer's "progress in the program and dynamic risk assessment issues." (Pen. Code, § 290.09, subd. (c).) By these provisions, the purposes of the psychotherapist-patient privilege waiver are expressly limited and comparatively well defined.

We find that the state's interest in furthering such communication is legitimate and substantial. The overriding goal of the Containment Model approach underlying the sex offender management program is public safety and the reduction of recidivism. The functioning of the model hinges in large part on open communication between the probation officer and the psychotherapist. (Cal. Sex Offender Management Bd., Sex Offender Treatment Program Certification Requirements, *supra*, at pp. 6-8.) Furthermore, probationers, like the parolee in *Gonzales*, are inherently subject to a greater degree of intrusion on their rights of privacy. (*United States v. Knights*, *supra*, 534 U.S. at p. 119.) Accordingly, we conclude that the state has a sufficiently substantial interest in communication between these participants to justify disclosure here.

26

We next consider whether the scope of the waiver is properly tailored to this interest, or whether the waiver must be more narrowly construed concomitant with the purposes of the exception. (*Stritzinger*, *supra*, 34 Cal.3d at p. 511; *Lifschutz*, *supra*, 2 Cal.3d at p. 435; *In re Sheena K.*, *supra*, 40 Cal.4th at p. 890.) Similar to the broad language used in the waiver of the privilege against self-incrimination, the language of the statute, read literally, requires the waiver of "*any* psychotherapist-patient privilege," regardless of the subject matter of the communication or the level of risk to public safety absent disclosure. The waiver does not distinguish between comparatively more dangerous or less dangerous probationers. But unlike the language of the waiver of the privilege against self-incrimination, this broad language is followed by the phrase "to enable communication between the sex offender management professional and supervising probation officer, pursuant to Section 290.09." This additional language limits what may be done with the probationer's communications once they are revealed.

We will therefore narrowly construe the statute as requiring a waiver of the psychotherapist-patient privilege only insofar as it is necessary "to enable communication between the sex offender management professional and supervising probation officer . . . ." (Pen. Code, § 1203.067, subd. (b)(4).) Specifically, we hold that defendant may constitutionally be required to waive the psychotherapist-patient privilege only to the extent necessary to allow the sex offender management professional to communicate with the supervising probation officer. Furthermore, the supervising probation officer may communicate defendant's scores on the SARATSO risk assessment tools to the Department of Justice to be made accessible to law enforcement as required under section 290.09, subdivision (b)(2). This narrow interpretation of the statute allows the psychotherapist to communicate with the probation officer as necessary, furthering the purposes of the exception as set forth in the statute. Apart from these exceptions, neither the psychotherapist nor the probation officer may relay protected communications to

27

some other third party under the waiver, and defendant's privacy rights based on the psychotherapist-patient privilege otherwise remain intact.[8]

### III.  DISPOSITION

In light of our holding that the waiver requirement in Penal Code section 1203.067, subdivision (b)(3) is unconstitutional, we strike the language "waive any privilege against self-incrimination and" from the probation condition implementing that subdivision.  As modified, the judgment is affirmed.

---

[8] Presiding Justice Rushing's separate concurrence notes that the right to privacy under the California Constitution also protects the confidentiality of a probationer's psychotherapist-patient communications.  (Cal. Const, art. I, § 1; *Pettus v. Cole* (1996) 49 Cal.App.4th 402, 440; *Scull v. Superior Court* (1988) 206 Cal.App.3d 784, 790.)  The waiver as narrowly construed above satisfies this state constitutional requirement.

_____
Márquez, J.

I CONCUR:

_____
Premo, J.

No. H040847
The People v. Rebulloza

RUSHING, P.J., Concurring

I agree with the majority opinion that defendant cannot be compelled to waive his immunity against self-incrimination, although he can be compelled to answer potentially incriminating questions, on pain of revocation of probation, so long as his answers cannot be used against him. I diverge somewhat from the majority opinion's approach, however, concerning the effect of defendant's statutorily required waiver of the psychotherapist-patient privilege. I believe California's express guarantee of the right of privacy (Cal. Const., art. I, § 1) compels a rule under which the waiver required by Penal Code section 1203.067, subdivision (b), permits the "sex offender management professional" to report to the probation officer upon the defendant's test scores, attendance, and general cooperativeness in the therapy process, but does not otherwise permit the professional to disclose, to the probation officer or anyone else, the content of any otherwise protected psychotherapeutic communications. To the extent Penal Code section 1203.067 may be understood or intended to require or permit disclosure of such communications, I would hold it violative of our state constitutional guarantee of privacy.

_____
RUSHING, P.J.

*People v. Rebulloza*
H040847

Trial Court:                                   Santa Clara County
                                               Superior Court No.: C1238226

Trial Judge:                                   The Honorable Michele McKay McCoy


Attorney for Defendant and Appellant           Paul Couenhoven
Juan Jose Rebulloza:                           under appointment by the Court of
                                               Appeal for Appellant




Attorneys for Plaintiff and Respondent         Kamala D. Harris,
The People:                                     Attorney General

                                               Gerald A. Engler,
                                               Senior Assistant Attorney General

                                               Laurence K. Sullivan,
                                               Supervising Deputy Attorney General

                                               Rene A. Chacon,
                                               Supervising Deputy Attorney General




People v. Rebulloza
H040847